J-A12023-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| CRAIG A. BIANCHINI | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| XIAO RONG ZHU | : | No. 66 EDA 2018 |

Appeal from the Order Entered December 21, 2017
In the Court of Common Pleas of Lehigh County
Civil Division at No(s):  2014-FC-1009

BEFORE:  BOWES, J., OTT, J., and FORD ELLIOTT, P.J.E.

MEMORANDUM BY OTT, J.:                    **FILED JULY 2, 2018**

Craig A. Bianchini appeals from the order entered in the Court of Common Pleas of Lehigh County on December 21, 2017, that determined the date of separation between him and his estranged wife, Xiao Rong Zhu, was July 30, 2014.  In this timely appeal, Bianchini raises three issues, although they all relate to the single claim that the trial court abused its discretion in determining the date of separation.  After a thorough review of the submissions by the parties, relevant law, and the certified record, we affirm.

Before we address the substance of this appeal, our standard of review for a challenge to the determination of the date of separation is abuse of discretion.

> Our standard of review is one of an abuse of discretion. "Absent an abuse of discretion, the trial court's findings of fact, if supported by credible evidence of record, are binding upon a reviewing court." ***Wellner v. Wellner***, 699 A.2d 1278, 1280 (Pa. Super. 1997) (citations omitted). Only property acquired "prior to

the date of final separation" is marital property and therefore subject to equitable distribution. 23 Pa.C.S. § 3501–02.

The date of final separation revolves around the definition of "separate and apart."

> The Divorce Code defines "separate and apart" as follows: "Complete cessation of any and all cohabitation, whether living in the same residence or not." 23 Pa.C.S. § 3103. In **Thomas v. Thomas**, 335 Pa.Super. 41, 483 A.2d 945 (1984), this court held that "cohabitation" means "the mutual assumption of those rights and duties attendant to the relationship of husband and wife." **Id.**, at 47, 483 A.2d at 948.
>
> Thus, the gravamen of the phrase "separate and apart" becomes the existence of separate lives not separate roofs (citations omitted). This position follows the trend of Pennsylvania case law in which a common residence is not a bar to showing that the parties live separate and apart … **Flynn v. Flynn**, 341 Pa.Super. 76, 81, 491 A.2d 156, 159 (1985). *Compare* **Mackey v. Mackey**, 376 Pa.Super. 146, 545 A.2d 362 (1988) (where parties had private living quarters, no public social life together, and had ceased sexual relations, the parties lived "separate and apart" despite the fact that they resided in the same house) *with* **Britton v. Britton**, 400 Pa.Super. 43, 582 A.2d 1335 (1990) (where parties jointly purchased a townhouse, shared a joint checking account, had a social life as husband and wife, share the same bedroom and resumed sexual relations, the court found the parties were not living "separate and apart.").

**Wellner**, 699 A.2d at 1281 (quoting **Schmidt v. Krug**, 425 Pa.Super. 136, 624 A.2d 183, 185 (1993) and **Gordon v. Gordon**, 436 Pa.Super. 126, 647 A.2d 530, 534 (1994) *rev'd on other grounds*, 545 Pa. 391, 681 A.2d 732 (1996)).

**Teodorski v. Teodorski**, 857 A.2d 194, 197-98 (Pa. Super. 2004) (footnote omitted).

The Divorce Code specifically addresses the date of separation. ***See***

23 Pa.C.S. § 3103. Our Court has stated:

> We are also aware that the definition of "separate and apart" found at 23 Pa.C.S. § 3103 was amended on November 29, 2004, and became effective January 28, 2005. Prior to the 2004 amendment, the term "separate and apart" was defined as: "[c]omplete cessation of any and all cohabitation, whether living in the same residence or not." Notably, "[s]ection 5(1) of Act 2004-175 provides that "the amendment of the definition of 'separate and apart' ... shall apply to complaints served before, on or after the effective date of this paragraph." 23 Pa.C.S. § 3103 Historical and Statutory Notes. Therefore, the fact that the complaint in the instant case was served prior to the amendment is of no moment; the amendment applies. The amended definition reads as follows:
>
>> Cessation of cohabitation, whether living in the same residence or not. In the event a complaint in divorce is filed and served, it shall be presumed that the parties commenced to live separate and apart not later than the date that the complaint was served.
>
> 23 Pa.C.S. § 3103 (as amended in 2004 with effective date as of January 28, 2005).
>
> The new version of the definition contains specific language pertaining to a presumption that the date of separation, *i.e.,* the date on which the parties begin living separate and apart, is established upon the filing and serving of a divorce complaint, unless an earlier date can be substantiated through the presentation of evidence confirming an earlier date. "A presumption ... is a procedural device which not only permits an inference of the 'presumed' fact, but also shifts to the opposing party the burden of producing evidence to disprove the presumed fact. Failure to meet this burden of production will normally result in [a decision] ... in favor of the party invoking the presumption.". ***Commonwealth v. Slaybaugh***, 468 Pa. 618, 364 A.2d 687, 689 (1976). In short, "[t]he party attempting to rebut the presumption has the burden of proof." ***CW v. LV***, 788 A.2d 1002 (Pa. Super. 2001).

***McCoy v. McCoy***, 888 A.2d 906, 911-12 (Pa. Super. 2005).

Finally, as the trial court noted, "the gravamen of the phrase 'separate and apart' [is] the existence of separate lives not separate roofs." ***Wellner v. Wellner***, 699 A.2d 1278, 1281 (Pa. Super. 1997), *quoting **Flynn v. Flynn***, 491 A.2d 156, 159 (Pa. Super. 1985).[1]

As noted above, the trial court determined July 30, 2014, the date Bianchini filed the complaint in divorce, as the date of separation. Zhu argues the presumptive date is correct; Bianchini asserts January 5, 2003 is the proper date. We must examine the trial court's factual findings to determine if an abuse of discretion occurred. If the record supports those factual findings, we are obliged to affirm. The trial court recited the factual history as follows:

> The material facts in this matter are largely undisputed. The parties in this case were married in Shanghai, China on December 16, 1994. In February of 1995, the parties moved to the United States. During the hearings before the Master, the parties testified they began experiencing marital problems very early in their marriage. [Bianchini] testified to an incident that occurred while the parties were on the plane flying from China to the United States where he and [Zhu] had a fight about a stewardess' conversation with [Bianchini] and his failure to identify [Zhu] as his wife to the stewardess.
>
> The fighting continued throughout the parties' relationship. In late 1995, the parties relocated to Jacksonville, Florida for [Bianchini's] work. They stayed at a Residence Inn during that period of time. [Bianchini] testified that as early as late-1995, while the parties lived in Florida, [Zhu] made comments to [Bianchini] during the course of verbal fights indicating she expected they would get divorced in the future. [Bianchini]

---

[1] Trial Court Opinion, 1/10/2018, at 11.

further testified [Zhu] threw her wedding rings at him "numerous times" during that time period.

In late-1996, the parties relocated to Vienna [Austria] for [Bianchini's] work. However, during this time, [Bianchini] testified he sent [Zhu] to live in Shanghai. The parties communicated by fax and telephone while they lived apart.

Following the completion of [Bianchini's] project in Vienna, [Bianchini] and [Zhu] moved back to the United States and resided with [Bianchini's] parents. In late-1996, [Bianchini] traveled by himself to Borneo for another project. [Zhu] was pregnant when [Bianchini] left, but while [Bianchini] was staying in Borneo, [Zhu] called and notified him that there was a problem with the baby. [Bianchini] flew back to Allentown and [Zhu] had a miscarriage. After that incident, the parties traveled to Borneo together.

During the parties' time in Borneo, [Bianchini] testified they continued fighting and [Zhu] continued making accusations about [Bianchini's] infidelity. While the parties were in Borneo, [Zhu] became pregnant again. She had difficulties with the pregnancy which prompted [Zhu] to return to the United States in 1997 to live with [Bianchini's] parents. While the parties were living apart from one another during that time, they regularly communicated by telephone call and fax. The parties' daughter was born on December 25, 1997.

[Bianchini] left again for two additional projects, one in India and one in Indonesia. Neither [Zhu] nor the parties' daughter traveled with him to these locations, but he returned to Allentown for two weeks at a time on two occasions during this project period.

[Bianchini] testified that around April of 1999, [Zhu] asked for a divorce. Despite that request, neither party filed for divorce and over the summer of 1999, the parties and their daughter moved to Florida so [Bianchini] could pursue a Master's degree. [Bianchini] testified that during this period of time, he and [Zhu] continued to fight frequently and their sexual relations largely ceased. However, they continued to live together and they remained in the same bedroom.

The parties left Florida and moved to New Hampshire in September of 2000. [Bianchini] testified that in October of 2001,

he sent [Zhu] and their daughter back to Shanghai to live with her parents while he lived with his parents. In February or March of 2002, [Bianchini] moved to China and lived with [Zhu], the parties' daughter, and [Zhu's] parents.

[Bianchini] testified that the parties' relationship did not experience any improvements after they moved to China. Their sex life was largely nonexistent. After [Zhu] complained about the lack of a sex life to a mutual friend, the parties had sex one time. According to [Bianchini's] testimony, that event resulted in the conception of their second child, who was born in June of 2003.

[Bianchini] testified regarding an incident that occurred on January 5, 2003, which he identified as the date of separation. According to [Bianchini] he was starting a work project in the southern part of China. The parties had an argument while residing in [Zhu's] parents' house. After the argument, [Bianchini] testified he took off his wedding band and returned it to [Zhu]. He subsequently moved into a dormitory associated with the factory where his project was based. He returned to obtain some of his clothing and personal belongings, but the parties ceased cohabiting at that point. [Bianchini] further testified that he asked [Zhu] to file for divorce in China due to the fact that she was a Chinese citizen and the parties were married in China.

Following this incident, [Bianchini] testified that contact between the parties decreased and was primarily limited to communications about the children. [Bianchini] periodically visited [Zhu] and the children during the subsequent six years, primarily staying at [Zhu's] parent's house. During that time period, while [Bianchini] visited [Zhu] and the children in China, all of them would sometimes stay in a hotel if [Bianchini] was not staying with [Zhu's] parents.

After [Bianchini] left the dormitory at his project site in China, he began living in a hotel and later a condominium. The parties did not cohabitate for any extended duration after their fight in early-January of 2003.

[Zhu's] testimony before the Master concerning the parties' time together from February of 1995 through January of 2003 was largely consistent with [Bianchini's] testimony. However, in the

reply brief in opposition to [Bianchini's] exceptions, [Zhu] asserts the alleged incident on January 5, 2003 about which [Bianchini] testified "simply did not occur. [Bianchini] never gave [Zhu] his wedding ring. In fact, [Bianchini] continued to wear his wedding ring for years following 2003. To this day, [Zhu] does not know where [Bianchini's] wedding ring is located." ([Zhu's] Reply Brief, at 4). [Zhu] did not support these assertions with any citation to testimony from either of the two days of testimony before Master Roberts. Based on a review of the transcripts from the Master's hearings, defense counsel did not cross-examine [Bianchini] about his testimony concerning the fight on January 5, 2003. Furthermore, [Bianchini's] testimony about the fight itself went unrebutted by [Zhu]. [Zhu] did not offer any testimony regarding the alleged incident in January of 2003.[2]

Instead, [Zhu] argued the parties' date of separation was much later based on the parties' interactions after the date [Bianchini] identified as the date of separation. [Zhu] asserts that even after the alleged incident where [Bianchini] claims to have returned his ring, from November of 2001 to November of 2009, [Bianchini] stayed with [Zhu] and the children at [Zhu's] parents' apartment in Shanghai when he was not away on business. During these occasions, the parties stayed in the same room and slept in the same bed in her parents' two-bedroom apartment. [Zhu] further asserted the parties maintained contact through email and telephone every few days. [Bianchini] continued using [Zhu's] parents' address as a mailing address until approximately 2010. [Zhu] also testified that until [Bianchini] filed a complaint in divorce, whenever she and the children came to the United States between 2002 and 2014, they resided with [Bianchini's] mother, who provided immigration-related assistance to [Zhu].

[Zhu] testified the parties attended Chinese New Year events with [Zhu's] family several times up through 2014. [Zhu] also testified the parties attended various events together, such as [Bianchini's] nephew's wedding in 2007, [Zhu's] cousin's wedding in March of 2011, and another cousin's wedding from [Zhu's] side of the family in 2011. [Zhu's] sister testified before Master Roberts that the parties attended her wedding in August of 2013. She indicated

---

[2] We note that the trial court cites, with approval, testimony from Zhu that circumstantially rebuts Bianchini's assertion that he returned his wedding ring to Zhu in 2003.

the parties arrived together, sat at the same table, and interacted with one another as a married couple.

Trial Court Opinion, 1/10/2018, at 2-7 (citations to the record omitted).

Based upon the testimony at the date of separation hearings, the Master determined that April, 2009, was the date of separation. This choice was based on the date of a Skype message between the parties wherein Zhu stated her desire for a divorce. The Master rejected the earlier date proposed by Bianchini, noting that an earlier date was certainly possible, but the disputed evidence was simply insufficient to affix a date with any certainty. *See* Trial Court Opinion, 1/10/2018, at 7-8.

The trial court rejected the Master's determination based upon the initial statutory presumption that the date of separation is the date of filing of the complaint in divorce and Bianchini's failure to rebut that presumption with any degree of certainty.

We have reviewed the certified record and note that this is a unique situation where the parties have always lived, to some extent, apart from each other. Bianchini's work took him around the world. Zhu was from China and maintained close ties to both her family and the country. Accordingly, living apart does not necessarily hold the same meaning in this specific situation as it might in a more "typical" familial situation.

Further, we do not take exception to Bianchini's assertion that the certified record contains evidence that could support a finding consistent with either his proposed date of separation or the Master's. Our duty, however, is not to retry the case and base our ruling on the evidence we pick and choose

to credit. Our duty is to examine the evidence and reasoning of the trial court and determine whether the trial court's holding is an abuse of discretion, that is, whether the trial court's ruling is based upon competent evidence of record. *See Teordorski*, *supra*. Our review of the certified record leads us to conclude the trial court's decision is, in fact, based upon such evidence and, accordingly, we are required to affirm.

To that end, the trial court recognized several ongoing situations that led it to conclude Bianchini had not overcome the initial presumption that the date of filing the complaint in divorce was the date of separation. Specifically, the trial court opined:

> The parties conceived their second child in 2002, and the child was born on June 19, 2003. [Zhu] testified the parties continued to maintain contact during her pregnancy despite [Bianchini's] absence due to work. This contact was after the date [Bianchini] identified as the date of separation. When the parties' second child was born on June 19, 2003, [Bianchini] stayed overnight with [Zhu] in the hospital one night and stayed with their older child at [Zhu's] parents' apartment for another three nights. The parties sent out a Christmas card to family and friends announcing the birth of their child, which was signed "Craig and Judy 12/03."
>
> The testimony also showed that after January 5, 2003, the parties maintained joint financial accounts. According to [Bianchini], he provided financial assistance to [Zhu] to take care of the children. During the same period of time, [Zhu] had access to the parties' joint back accounts and credit cards which was only terminated at the time [Bianchini] filed for divorce.

Trial Court Opinion, 1/10/2018, at 13.

The trial court also found the parties had a fight in October 2009, well after Bianchini's proposed date of separation, over messages to other women,

which Zhu found on Bianchini's computer. "After that fight though, neither party took any affirmative steps to file for divorce, and the parties continued to spend the night together whenever [Bianchini] came to visit the children. The parties shared the same bed at the hotel in which they stayed." *Id.*

> According to [Zhu], throughout 2010, whenever [Bianchini] was not working, he would return to Shanghai. When [Bianchini's] father passed away in the summer of 2010, the parties stayed at [Bianchini's] parents' home for a week after the funeral. [Zhu's] sister testified that the parties showed up at a family gathering in April of 2011 and spent time there together.

*Id.* at 14. Moreover,

> As late as June of 2014, the parties had a conversation regarding [Zhu] and the parties' children moving to Allentown from China. [Bianchini] objected, citing financial reasons. In an email [Bianchini] wrote to [Zhu] on June 16, 2014, he stated, "We are not rich and do not have an unlimited source of money." [Bianchini] went on to say, "Trust me…I am not happy and am not enjoying my life. Everything I wanted to do in life will never happen *now that I am married.* I had to give it all up…" The email also repeatedly referenced the parties as "we" and discussed their joint financial status.

*Id.* (emphasis added). We note Bianchini sent this email only weeks before he filed the complaint in divorce.

Furthermore, the trial corut noted:

> Most telling, the parties regularly attended events together after the date [Bianchini] identifies as the date of separation. As mentioned before, for a number of years between 2003 and 2011, the parties celebrated Chinese New Year together with [Zhu's] family. In 2007, the parties attended [Bianchini's] nephew's wedding near Philadelphia, after which they stayed in the same room at [Bianchini's] parents' home. In March of 2011, the parties attended [Zhu's] cousin's wedding in Shanghai. They also attended a wedding for another of [Zhu's] cousins in August of 2011, and [Zhu's] sister's wedding in August of 2013. [Zhu's]

- 10 -

> sister testified the parties arrived together, sat at the same table, and interacted with one another as a married couple.

*Id.* At 14.[3]

In light of the above, we must agree with the trial court that Bianchini has failed to rebut the statutory presumption that the date of separation in this matter is the date Bianchini filed the complaint in divorce. After the dates of separation proposed by both Bianchini and the Master had passed, the couple repeatedly interacted as a married couple. They shared a bed and finances. They traveled the world, as a couple, from Shanghai to Allentown to attend each other's family functions. They complained about each other's behavior, but they took no affirmative steps to end their marriage until July 30, 2014, when Bianchini filed the complaint in divorce. The trial court's holding is supported by evidence of record and does not represent an abuse of discretion.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/2/18

---

[3] Citations to the record, for all of the quotes related above, have been omitted.